UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MYECHECK, INC., | No. 2:14-cv-02889-KJM-AC |
| Plaintiff, | |
| v. | ORDER |
| SWEETSUN INTERTRADE, INC., et al., | |
| Defendants. | |

This matter is before the court on defendant Scottsdale Capital Advisors' motion to dismiss. ECF No. 19. The other defendants, Sweetsun Intertrade, Inc., Seven Miles Securities, and Titan International Securities, Inc., have not yet appeared. MyECheck (MYEC) filed an opposition and requested leave to amend. ECF No. 22. The court held a hearing on this matter on July 24, 2015, at which Brian Katz appeared for MYEC and Alan Baskin for Scottsdale. For the following reasons, the motion to dismiss is GRANTED with prejudice and without leave to amend.

I.     BACKGROUND

For purposes of this motion, the court assumes the following allegations are true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In 2012, Sweetsun told MYEC it had purchased a $32,200 promissory note from Tangiers Investors, L.P., entitling it to MYEC shares. Compl.

1

¶¶ 10−12, ECF No. 1.  Sweetsun had never actually purchased a promissory note and had no right to the shares.  *Id.* ¶ 16.  Oblivious to the fraud, MYEC issued shares to Sweetsun and Titan, as directed by Sweetsun.  *Id.* ¶¶ 13−14.  MYEC believes the shares issued to Titan were sent to Scottsdale.  *Id.* ¶ 14.  Sweetsun also induced MYEC's transfer agent to issue additional shares in MYEC, none of which were authorized, including shares sent to Seven Mile and Sweetsun.  *Id.* ¶ 17.

MYEC discovered the fraud in October 2013.  *Id.* ¶ 18.  On about November 13, 2013, MYEC contacted Scottsdale and requested it freeze trading in the fraudulent shares.  *Id.* ¶ 23.  Scottsdale froze the shares temporarily, but on January 16, 2014, it emailed MYEC to say it could not continue a freeze without a temporary restraining order.  *Id.* ¶ 24.  The remaining 560,005,000 shares, held by Seven Miles, Titan, and an unknown entity are currently worth about $16 million.  *Id.* ¶¶ 28–29.  MYEC seeks to enjoin the defendants, including Scottsdale, from transferring these remaining shares.  *Id.* at 10.

MYEC filed its complaint in December 2014.  *Id.* at 11.  Approximately five months later, no other party had appeared, and the court issued an order for MYEC to show cause why its complaint should not be dismissed for failure to prosecute.  ECF No. 7.  MYEC responded and reported it had completed service on Seven Miles and Scottsdale, but the other defendants' foreign status made service difficult.  ECF No. 12 (citing Article 2 of the Hague Convention).[1]

Scottsdale filed the pending motion to dismiss on June 1, 2015.  ECF No. 19.  It asserts it is merely a broker-dealer that clears and sells restricted stock, ensuring the stock meets certain federal conditions for sale.  *Id.* at 3.  It denies ever owning any of the relevant MYEC stock, but agrees it held the certificates for purposes of obtaining confirmation that the shares were marketable.  *Id.* at 4.  Scottsdale acknowledges MYEC's request to freeze the shares in November 2013, but asserts MYEC made no specific allegation of fraud; rather MYEC only indicated the shares were issued "in error."  *Id.* at 4−5.  Scottsdale also points out that MYEC

---

[1] The order to show cause is hereby discharged.

never pursued a temporary restraining order and filed this action almost a year after its earlier correspondence.  *Id.* at 6.

In light of these assertions, Scottsdale argues MYEC lacks standing.  *Id.* at 7–13.  Additionally, Scottsdale argues MYEC is barred by laches because its allegations show MYEC's efforts - or absence thereof - lacked diligence and caused prejudice to Scottsdale.  *See id.* at 13–15 (citing *Apache Survival Coal v. United States*, 21 F.3d 895, 905 (9th Cir. 1994)).  Finally, Scottsdale argues MYEC's claims must be dismissed for failure to join indispensable parties under Federal Rule of Civil Procedure 19(a)(1), because MYEC did not join the current MYEC shareholders, who now own the MYEC shares at issue.  *Id.* at 15.

MYEC addresses none of these arguments in its opposition, but requests leave to amend its complaint to include new allegations against Scottsdale under section 8-115 of the Uniform Commercial Code.  Opp'n 4–6 (citing U.C.C. § 8-115(2)).  That section allows for the liability of a "securities intermediary" or "broker" who "acted in collusion with the wrongdoer in violating the rights of the adverse claimant."  *Id.*  MYEC has not attached a proposed amended complaint to its opposition; it does describe discrepancies in the documents Scottsdale relied on when it lifted the freeze on MYEC shares.  *See id.* at 5.

II.     DISCUSSION

    A.     Motion to Dismiss

MYEC opposes Scottsdale's motion, but contests none of Scottsdale's factual assertions and omits any argument against dismissal other than to request leave to amend.  By ignoring these arguments, MYEC tacitly concedes dismissal of its claims is appropriate.  *See Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006); *Silva v. U.S. Bancorp*, No. 10-01854, 2011 WL 7096576, at *2–3 (C.D. Cal 2011) (citing *Tatum v. Schwartz,* No. 08−16987, 2007 WL 419463, *3 (E.D. Cal. 2007)).  At hearing, MYEC agreed Scottsdale's motion should be granted with prejudice and without leave to amend as to the claims originally pleaded.

B. <u>Leave to Amend</u>

As noted above, MYEC requests leave to amend. Federal Rule of Civil Procedure 15(a)(2) provides: "The court should freely give [leave to amend] when justice so requires," and the Ninth Circuit has "stressed Rule 15's policy of favoring amendments." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989.) "In exercising its discretion [regarding granting or denying leave to amend] 'a court must be guided by the underlying purpose of Rule 15—to facilitate decision on the merits rather than on the pleadings or technicalities.'" *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (quoting *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981)). However, "the liberality in granting leave to amend is subject to several limitations. Leave need not be granted where the amendment of the complaint would cause the opposing party undue prejudice, is sought in bad faith, constitutes an exercise in futility, or creates undue delay." *Ascon Props.*, 866 F.2d at 1160 (internal citations omitted). Not all the factors merit equal weight; prejudice to the opposing party carries the greatest weight. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Here, Scottsdale argues MYEC's request was procedurally deficient, unduly delayed, and should be denied because amendment would be futile.

1. <u>Procedural Impropriety</u>

This district's Local Rules provide: "If filing a document requires leave of court, such as an amended complaint after the time to amend as a matter of course has expired, counsel shall attach the document proposed to be filed as an exhibit to moving papers seeking such leave and lodge a proposed order as required by these Rules." E.D. Cal. L.R. 137(c). All motions must also be noticed on this court's civil law and motion calendar, *id.* R. 230(b), unless filed as an *ex parte* application, and then must comply with this court's standing order, ECF No. 3-1. MYEC did not attach a proposed amended complaint to its opposition, did not file a motion or notice of hearing, and did not comply with the standing order's provisions on ex parte requests. These shortfalls make adjudication of the parties' dispute more difficult and less efficient, but do not alone warrant a denial of MYEC's request. Counsel is cautioned against future violations of the court's orders and the Local Rules.

4

      2.    <u>Delay</u>

MYEC's timing in seeking amendment is questionable.  In response to MYEC's request for leave to amend, Scottsdale filed copies of email correspondence sent to MYEC's counsel five months before Scottsdale moved to dismiss.  *See* Cruz Decl. ¶¶ 2–3 & Ex. 1, ECF No. 24-1.  To these emails Scottsdale attached the evidence it relied on when it decided to revoke the freeze on MYEC shares, *see id.*, the same documents MYEC cites to support its request for leave to amend, *see* Opp'n at 5.  These documents include a July 31, 2013 letter from Thomas Russell, who purported to be "counsel to MYECHECK, Inc."  Cruz Decl. Ex. 1, at 16–19,[2] ECF No. 24-1.  Mr. Russell gave his opinion that the $32,200 note, discussed above, was a binding obligation to MYEC, was duly assigned by Tangiers to Sweetsun, and entitled Sweetsun to 300 million MYEC shares.  *Id.* at 19.  The documents also included a copy of a letter from the "Law Office of Thomas Russell" addressed "To whom it may concerned [sic]," enclosing a check for $9,100.  *Id.* at 12–13.  The letter included a copy of the enclosed check, which was addressed to "Tangiers Investors LPC," was paid from Mr. Russell's "Client Trust Account," and included the note, "Sweetsun Intertrade Inc. MyECheck Client Distr. Assignments 9/10/12 4/30/13 7/26/13."  *Id.* at 13.

MYEC's counsel acknowledged receipt of the email and attachments on February 6, 2015, and said he would discuss them with his client.  *See* Cruz Decl. ¶ 4 & Ex. 2.  But counsel did not request leave to amend the complaint until opposing Scottsdale's motion to dismiss on July 10, 2015.  This delay, although substantial, is not so prejudicial as to warrant denial of MYEC's request.  Discovery has not yet commenced, no trial has been set, and the proposed new claim would not substantially alter the nature of MYEC's complaint.  *Cf. Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990); *DCD Programs*, 833 F.2d at 187−88.

---

[2] Pages cited in this document are those printed at the top of each page by the CM/ECF system.

3.      Futility

If allowed leave to amend, MYEC explains it would assert a claim "against Scottsdale pursuant to U.C.C. § 8-115(2)." Opp'n at 6 (capitalization altered). California has adopted section 8-115 of the Uniform Commercial Code and its comments. *See* Cal. Com. Code § 8115. That section provides, in relevant part,

> A securities intermediary that has transferred a financial asset pursuant to an effective entitlement order, or a broker or other agent or bailee that has dealt with a financial asset at the direction of its customer or principal, is not liable to a person having an adverse claim to the financial asset, unless the securities intermediary, or broker or other agent or bailee . . . [a]cted in collusion with the wrongdoer in violating the rights of the adverse claimant. . . .

*Id.* The parties agree, at least for purposes of this motion, that section 8115 applies to Scottsdale in general. *See* Opp'n at 4–6; Reply at 6–7.

"As a general proposition, section 8115 immunizes brokers from liability in connection with their activities as conduits for the transfer of securities on behalf of their customers." *Decker v. Yorkton Sec., Inc.*, 106 Cal. App. 4th 1315, 1320–21 (2003); *see also* Cal Com. Code § 8115 cmt. 2. Under section 8115, "a broker will not be liable even if it 'has notice that someone asserts a claim to a customer's securities or security entitlements,' because 'the firm should not be placed in the position of having to make a legal judgment about the validity of the claim at the risk of liability either to its customer or to the third party for guessing wrong.'" *Id.* at 1321 (quoting Cal. Com. Code § 8115 cmt. 3). In other words, a defendant intermediary or broker "is privileged to act on the instructions of its customer or entitlement holder, unless it has been served with a restraining order or other legal process enjoining it from doing so," Cal. Com. Code § 8115 cmt. 3, because "[i]t is not the role of the record-keeper to police whether the transactions recorded are appropriate," *id.* cmt. 5. The broker's knowledge of an adverse claim "is a necessary but not sufficient condition of the collusion test." *Id.*

Paragraph 2 of section 8115 is meant to carve out "egregious cases," in which defendants' actions "go[] beyond the ordinary standards of the business of implementing and recording transactions, and reach[] a level of affirmative misconduct in assisting the customer in the commission of a wrong." *Id.* Another federal district court, interpreting the identically

6

worded provisions of Michigan law on a motion to dismiss, found that paragraph 2 does not apply if the defendant allegedly ignored red flags but took no affirmative steps. *See H & R Block Fin. Advisors, Inc. v. Express Scripts, Inc.*, 426 F. Supp. 2d 656, 661–63 (E.D. Mich. 2006) (interpreting Mich. Compl. L. § 440.8115). To find otherwise, in that court's opinion, would "turn a negative into a positive." *Id.* at 663. Later, on summary judgment, upon revelation that the defendant had not only ignored red flags but had "pressur[ed] a 78-year-old woman to sell stock that she insisted did not belong to her," the same court found section 8-115 could not preclude liability. *H&R Block*, No. 05-73306, 2006 WL 2125226, at *6 (E.D. Mich. July 27, 2006); *see also Pine Belt Enterprises, Inc. v. SC & E Admin. Servs., Inc.*, No. 04-105, 2005 WL 2469672, at *7 (D.N.J. Oct. 6, 2005) (finding broker was not liable under analogous New Jersey provision despite plaintiffs' allegations that defendant "conducted no due diligence before transferring funds from the Account"); *but see Davis v. Sterne, Agee & Leach, Inc.*, 965 So. 2d 1076, 1086 (Ala. 2007) (finding U.C.C. section 8-115 does not protect a defendant who transferred a financial asset in reliance on a forged document; citing *Watson v. Sears*, 766 N.E.2d 784 (Ind. Ct. App. 2002) and *Powers v. Am. Express Fin. Advisors, Inc.*, 82 F. Supp. 2d 448 (D. Md. 2000), *aff'd*, 238 F.3d 414 (4th Cir. 2000)).

       Here, MYEC cites three aspects of Sweetsun's paperwork to argue Scottsdale faces liability under section 8115(2): (1) the number of shares approved in MYEC corporate resolutions are not the same as the number of shares MYEC told Scottsdale were fraudulently issued; (2) the checks to Sweetsun postdated its reported purchase by many months and were issued from Sweetsun's attorney's trust account rather than Sweetsun's own account; (3) some of the documents bear what appear to be electronic signatures rather than signatures applied by hand. MYEC also points out that it told Scottsdale the shares were issued in error and later clarified that the shares were issued fraudulently.

       Assuming these allegations are true, and construing the cited documents in the light most favorable to MYEC, it can at most be said that Scottsdale ignored red flags and overlooked suspicious circumstances, but undertook no affirmative misdeed. MYEC makes out a possible case of collusion, but not a plausible case. *See Iqbal*, 556 U.S. at 679 ("[W]here the

7

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (quoting Fed. Rule Civ. Proc. 8(a)(2)).  MYEC does not describe why or how these discrepancies confirmed the alleged fraud, let alone explain why the documents are evidence Scottsdale colluded with the other defendants.

MYEC protests that it told Scottsdale the shares were issued fraudulently and argues this is sufficient evidence of collusion.  As noted above, Scottsdale's knowledge of an adverse claim "is a necessary but not sufficient condition of the collusion test." Cal. Com. Code § 8115, cmt. 5.  Section 8115 and its comments repeatedly paraphrase the same rule: a securities intermediary or broker need not make legal judgments or police its customer's claims and is privileged to act on the instruction of one customer, even if it is aware of another's competing claim.

Lastly, MYEC advances no argument to oppose Scottsdale's laches defense, which would apply equally to the proposed amendment: despite a claimed fraud and Scottsdale's advice to obtain a temporary restraining order, MYEC delayed filing a complaint or obtaining any court order and so exacerbated its damages.  Amendment would be an exercise in futility.

III.     CONCLUSION

Scottsdale's motion to dismiss, ECF No. 19, is GRANTED with prejudice and without leave to amend.

IT IS SO ORDERED.

DATED: October 16, 2015.

_____
UNITED STATES DISTRICT JUDGE

8